UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

WVF Acquisition, LLC
f/k/a WV Fiber Acquisition, LLC                    Chapter 11

    Debtor.                                        Case No.: 09-30483-EPK
_____/

**EMERGENCY MOTION FOR CONTEMPT
FOR VIOLATION OF THE AUTOMATIC STAY**

**[Emergency Hearing Requested for September 29, 2009]**

**\*\*Emergency Hearing Requested Pursuant to Local Rule 9075-1\*\***

**The Debtor requests an emergency hearing in this matter to prevent immediate and irreparable harm that would occur to the Debtor's estate if the services provided by WBS Connect, LLC are not restored. As such, the Debtor requests an emergency hearing to be scheduled at this Court's first available date. This Motion is being filed in the alternative as to Docket Entry 13.**

Debtor, WVF Acquisition, LLC f/k/a WV Fiber Acquisition, LLC (the "**Debtor**"), by and through its undersigned counsel, hereby moves, pursuant to 11 U.S.C. § 362, for the entry of an order finding WBS Connect, LLC ("**WBS Connect**") in contempt of this Court for a knowing and willful violation of the automatic stay (the "**Motion**"), and in support thereof, respectfully states as follows:

**JURISDICTION**

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

2.    This is a core proceeding as defined by 28 U.S.C. § 157(b)(2).

3.    The statutory predicates in support of the relief requested herein are 11 U.S.C. §§ 105(a) and 362.

1

4.     On September 27, 2009, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Petition Date**").

## BACKGROUND

5.     The Debtor is operating its business and managing its affairs as debtor-in-possession pursuant to the authority of sections 1107(a) and 1108 of the Bankruptcy Code.

6.     To date, no trustee, examiner, or statutory committee has been appointed in this case.

7.     The Debtor is a global communication and information services company that, *inter alia,* provides internet access to customers in over thirty-five major markets throughout North America and Europe.

8.     As part of the Debtor's supply of internet services, the Debtor purchases dedicated internet access from WBS Connect, which in turn secures internet access for the Debtor through Sprint Nextel Corporation.

9.     All monthly payments for the internet services provided by WBS Connect to the Debtor are due in advance on the last day of the month immediately preceding the month for which the internet services are to be provided.  Thereafter, WBS Connect invoices the Debtor for any bandwidth usage exceeding the minimum amount purchased for a prior month.  A true and correct copy of the Master Services Agreement (the "**Agreement**") between the Debtor and WBS Connect is attached hereto as **Exhibit "A."**

10.    For the month of September, the Debtor prepaid WBS Connect $35,580.00 for a minimum amount of bandwidth usage for September (the "**September Payment**").  A true and correct copy of the invoice is attached hereto as **Exhibit "B."**

11.     Thereafter, WBS Connect threatened to disconnect the Debtor's internet services, which is what prompted the Debtor's chapter 11 filing.

12.     On the Petition Date, the Debtor sent WBS Connect a letter (the "**Letter**") notifying WBS Connect that it filed a voluntary petition for relief under Chapter 11.

13.     WBS Connect acknowledged receipt of the Letter as evidenced in an email correspondence sent from WBS Connect to the Debtor at 5:34 p.m. on Sunday, September 27, 2009. A true and correct copy of the Letter sent to WBS Connect and the email correspondence from WBS Connect acknowledging receipt of the Letter is attached hereto as **Exhibit "C."**

14.     On September 28, 2009, with full knowledge of the Debtor's bankruptcy filing, WBS Connect intentionally disconnected the internet services it provides to the Debtor. As such, the Debtor's motivation in filing the Chapter 11 case was thwarted by WBS Connect's unilateral and intentional acts in violation of Federal law.

15.     As a result, the Debtor's estate is in serious peril as seven major markets that the Debtor provides internet access to are currently disconnected, including: i) Miami, Florida; ii) San Jose, California; iii) Ashburn, Virginia; (iv) NY, New York; (v) Atlanta, Georgia; (vi) Chicago, Illinois and (vii) Los Angeles, California.

16.     The outage affected the entire network and all customers on it, including the Debtor's largest customer, Charter Communication, the nation's 3rd largest cable company. Charter Communication provides cable TV, internet and phone service to over five million people across the United States and the Debtor is Charter Communications' primary provider of internet in nearly all major markets.

17.     It is imperative that the internet access provided by WBS Connect to the Debtor is restored immediately in order for the Debtor to continue to operate. <u>Every minute that internet</u>

<u>access is disconnected, the Debtor incurs damages based upon credits due to customers.</u> Furthermore, the Debtor faces substantial risk of losing customers.

## RELIEF REQUESTED

18. By this Motion, the Debtor seeks the entry of an Order: i) requiring the reconnection of the internet services provided by WBS Connect under the Agreement; ii) finding WBS in contempt pursuant to 11 U.S.C. §§ 105 and 362 and iii) awarding sanctions in the form of compensatory damages for costs and fees incurred in bringing this matter before the Court and punitive damages pursuant to 11 U.S.C. § 362(k)(1).

## BASIS FOR RELIEF REQUESTED

19. 11 U.S.C. § 362(a) provides in pertinent part:
    (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—
    (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
    …
    (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate ….

20. Therefore, 11 U.S.C. § 362(a)(1) stays actions against the Debtor.

21. Moreover, Courts have unanimously held that unilaterally terminating a contract without first obtaining relief from stay warrants actual and punitive damages under 11 U.S.C. § 362. *In re Computer Commc'ns, Inc.*, 824 F.2d 725, 730 (9th Cir. 1987). *See also In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760 (Bankr. M.D. Fla. 2009) (finding that automobile finance

4

company could not terminate retail installment contract with the debtor without obtaining relief from stay).

22.     Under the weight of authority, contracts have been said to be embraced in the statutory definition of "property." *Id.* (*citing In re Davis,* 730 F.2d 176, 184 (5th Cir.1984)). For example, even the right to cancel an insurance policy issued to the debtor has uniformly been held to be stayed under section 362(a)(3). *Id.* (citing Lam, *Cancellation of Insurance: Bankruptcy Automatic Stay Implications,* 59 Am.Bank.L.J., 267 (1985)).  An insurance policy is valuable property of a debtor, particularly if the debtor is confronted with substantial liability claims within the coverage of the policy in which case the policy may well be, "the most important asset of [ *i.e.,* the debtor's] estate," *Id.* (*citing In re Johns Manville Corp.,* 40 B.R. 219, 229 (S.D.N.Y.1984)).

23.     In the instant case, upon learning of the Debtor's bankruptcy filing, WBS Connect unilaterally terminated the Agreement by intentionally disconnecting internet services that it provides to the Debtor.  As a result, the Debtor's operations have been crippled as seven major markets that the Debtor services as an internet provider are currently disconnected.  Furthermore, the Debtor has incurred significant costs and expenses because customers in the affected areas shall be entitled to credits from the Debtor for the disruption in internet services.

24.     The estate should not have to incur attorneys' fees and cost in bringing this matter before the Court, and the Debtor submits that the award of a sanction equal to those fees and costs incurred would be appropriate.  In fact, prior to the filing of this motion, the Debtor's principal reached out to every WBS Connect contact he knew to try to resolve this matter.  Even worse, undersigned counsel spoke with counsel for WBS Connect who, as of the time of this motion, has failed to have his client reconnect the internet services.

25. In order to deter WBS Connect from further violating the automatic stay, the Debtor submits that it would be appropriate to award punitive damages, and assess those damages as sanctions against WBS Connect in order to further the deterrent purpose of 11 U.S.C. § 362(k)(1).

**WHEREFORE**, the Debtor, WVF Acquisition, LLC, respectfully requests the entry of an Order by the Court i) requiring the reconnection of the internet services by WBS Connect under the Agreement; ii) finding WBS Connect in contempt pursuant to 11 U.S.C. §§ 105 and 362 and iii) awarding sanctions in the form of compensatory damages for costs and fees incurred in bringing this matter before the Court, compensatory damages for the Debtor's actual damages incurred and punitive damages pursuant to 11 U.S.C. § 362(k)(1).

### CERTIFICATE OF EXIGENT CIRCUMSTANCES

**I HEREBY CERTIFY** that an emergency hearing has been requested, since the relief requested is critical to the administration of this estate and to the Debtor's business operations. Without this contract, the Debtor will be compelled to shut down its operations.

[*Signature Page Follows*]

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing or E-Mail this 29th day of September, 2009 to all persons on the attached Service List.

    **I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

        **Respectfully submitted,**
        **SHRAIBERG, FERRARA & LANDAU, P.A.**
        Proposed Attorneys for the Debtor
        2385 NW Executive Center Drive, #300
        Boca Raton, Florida 33431
        Telephone: 561-443-0800
        Facsimile: 561-998-0047
        Email: jpage@sfl-pa.com

        By: /s/*John E. Page*
            Bradley S. Shraiberg
            Fla. Bar No. 121622
            John E. Page
            Fla. Bar. No. 0860581

## **SERVICE LIST**

**Via CM/ECF:**

       Office of US Trustee
       USTPRegion21.MM.ECF@usdpj.gov

**Via Email:**

       Jonathan Jackson Pledger
       Counsel for WBS Connect, LLC
       jjpledger@comcast.net

       WBS Connect, LLC
       c/o Michael Hollander
       mike@wbsconnect.com

# Master Services Agreement

### wbsconnect

This Master Services Agreement ("Agreement") dated as of the __1st__ day of __Sept__, 2008 is by and between WBS Connect, LLC, a Colorado limited liability company ("WBS Connect"), and WV FIBER ACQUISITION, LLC, a Florida limited liability company ("Customer").

**1. Services**

a. Customer agrees to purchase from WBS Connect and WBS Connect agrees to provide Dedicated Internet Access and, to the extent requested, colocation services ("Services") as specified in one or more service orders duly executed in substantially the form Customer Service Orders ("CSO") found at www.wbsconnect.com/msa/sf/annex-b.pdf. Each proposed Customer Service Order shall be consecutively numbered and include a "Quote Date". To be binding, a Customer Service Order must be executed by both parties within 30 days following the "Quote Date". If a Customer Service Order is not executed by Customer within the 30-day period (or such other period expressly provided in the Customer Service Order), the Customer Service Order shall be null and void and of no further force and effect.

b. Upon execution in accordance with the provisions of Section 1(a), any such Customer Service Order shall automatically be incorporated as part of this Agreement and shall be subject to all terms and conditions of this Agreement. To the extent that terms or conditions of a Customer Service Order conflict with terms or conditions of this Agreement, the Colocation Rider (defined below) or the Additional Terms and Conditions (defined below), the terms and conditions of the Customer Service Order shall govern unless, and only to the extent, expressly provided otherwise in this Agreement, the Colocation Rider or the Additional Terms and Conditions, as the case may be. If Customer and WBS Connect execute multiple Customer Service Orders, each additional Customer Service Order will supplement rather than replace the prior Customer Service Order, unless otherwise expressly stated by the parties in writing. Notwithstanding anything in this Agreement to the contrary, WBS Connect has no obligation to execute any Customer Service Order with Customer.

c. Any modification of a Customer Service Order shall be evidenced in writing by a Move/Add/Change/Delete Order ("MACD Order") in substantially the form found at www.wbsconnect.com/msa/sf/annex-c.pdf, **and executed by WBS Connect and Customer.** Such MACD Order shall modify the specified Customer Service Order to the extent, and only to the extent, expressly provided in the MACD Order. All other terms and conditions of the specified Customer Service Order shall remain unchanged and in full effect.

d. The Services will be subject to the Additional Terms and Conditions found at www.wbsconnect.com/msa/sf/annex-d.pdf and such Additional Terms and Conditions are incorporated as part of this Agreement. To the extent that terms or conditions of the Additional Terms and Conditions conflict with terms or conditions of this Agreement or the Colocation Rider (defined below), the terms and conditions of this Agreement or the Colocation Rider, as the case may be, shall govern unless, and only to the extent, expressly provided otherwise in the Additional Terms and Conditions.

e. Each Customer Service Order shall include a "Requested Install Date" for each product listed on the Customer Service Order. WBS Connect will in good faith use reasonable efforts to complete installation of each product by the respective "Requested Install Date", provided, that WBS Connect shall provide written notice to Customer immediately upon determining that it will not be able to complete installation by the Requested Install Date, and Customer shall be entitled to terminate this Agreement and any CO's executed thereunder with no liability.

f. If Services include colocation services, the parties shall execute a colocation rider ("Colocation Rider") in the substantially the form found at www.wbsconnect.com/msa/sf/annex-e.pdf. Upon execution, any such Colocation Rider shall automatically be incorporated as part of this Agreement and shall be subject to all terms and conditions of this Agreement. To the extent that terms or conditions of the Colocation Rider conflict with terms or conditions of this Agreement, the terms and conditions of the Colocation Rider shall govern unless, and only to the extent, expressly provided otherwise in this Agreement.

**2. Effective Date and Term**

Unless otherwise terminated in accordance with the provision contained herein, (i) the initial term of this Agreement shall begin on the date that Services are available for use by Customer ("Effective Date") and end 12 months from the Effective Date, and (ii) the term of this Agreement and all installed CSOs under this Agreement shall thereafter automatically terminate, unless either party gives written notice to the other party of renewal at least sixty (60) days but not more than ninety (90) days before the end of the applicable term. Notwithstanding anything to the contrary contained in this Agreement or otherwise, in no case shall this Agreement terminate if there are any outstanding CSOs that will not be terminated contemporaneously with the termination of this Agreement. If there are any outstanding CSOs at the time this Agreement would terminate, this Agreement shall remain in effect until expiration of all CSOs (which shall automatically terminate at the conclusion of their respective terms, unless either party gives written notice to the other party of renewal at least sixty (60) days but not more than ninety (90) days before the end of the applicable term) and then shall automatically terminate. Notwithstanding anything to the contrary contained in this Agreement, the Customer may immediately terminate this Agreement and any and all CSOs executed hereunder without any further liability in the event that WBS Connect (a) suffers an involuntary petition in bankruptcy to be filed against it, and fails to have such involuntary petition dismissed within sixty (60) days of the petition date (b) files any petition in any reorganization, arrangement, compromise, readjustment, liquidation, or dissolution or similar relief for itself, (c) becomes unable to pay its debts generally as they become due, or (d) fails to perform or observe any material term or obligation contained in this Agreement or under any CSO, and fails to cure such breach within thirty (30) days of receipt of written notice from Customer setting forth the nature of such default with reasonable particularity.

**3. General Payment Terms**

All Monthly Recurring Charges (as specified on the outstanding CSOs) are due and payable in advance on the last day of the month immediately preceding the month for which the Services are to be provided, and the Initial Payments (as specified on the outstanding CSOs) are due and payable on the date Customer executes the applicable CSO, (in each case, the "Due Date"). Such amounts shall be evidence by an invoice which shall be delivered to Customer on or before the tenth (10th) day of the month during which the Services are provided, but in no case shall the timing of invoices affect the Due Dates specified in this Section 3.

**4. Burst Usage Payment Terms**

WBS Connect will measure Customer's bandwidth usage in five minute intervals, for each point of connection between Customer and WBS Connect (or its up-stream provider) in two categories: incoming and outgoing. At the end of each billing cycle, all data samples in each category will be sorted from highest to lowest and the top 5% of measurements will be discarded. The highest remaining data sample in the higher of the two categories will then constitute the bandwidth usage level for that particular billing cycle. Burst usage is the amount of bandwidth usage for the particular billing cycle exceeding Customer's Minimum Committed Data Amount (as specified on the applicable CSO). Monthly burst usage charges shall be invoiced monthly in arrears and shall be due and payable on the Monthly Recurring Charges Due Date next following the date on which the invoice is received ("Due Date" for burst usage charges).

**5. Interest; Billing Disputes**

Any amounts not paid by the end of the grace period applicable thereto pursuant to the terms of this Agreement shall bear interest from such Due Date until paid in full at the rate per annum equal to the Prime Rate plus two percent, where Prime Rate means the rate of interest published by The Wall Street Journal as the prime rate in the column entitled "Money Rates", such rate to change automatically effective with each change in such prime rate. Invoices to Customer shall be deemed valid unless Customer disputes amounts so invoiced to Customer in writing within 30 days of the date on which the invoice is received. All billing disputes to be considered MUST be sent to disputes@wbsconnect.com within 30 days of the applicable invoice date.

**6. Service Level Agreement**

WBS Connect will provide Customer with the same service level guarantees as are provided to WBS Connect by the carrier set forth in the applicable CSO.

**7. Default and Termination**

A "Customer Default" shall occur if Customer (a) fails to make payment as required under this Agreement and such failure remains uncorrected for ten (10) days after the applicable Due Date; (b) fails to perform or observe any material term or obligation contained in this Agreement or under any CSO, and fails to cure such breach within thirty (30) days of receipt of written notice from WBS Connect setting forth the nature of such default with reasonable particularity; (c) uses the Services for any unlawful purpose or in any unlawful manner, or violates Carrier's Acceptable Use Policy, , and fails to cure such breach within thirty (30) days of receipt of written notice from WBS Connect setting forth the nature of such default with reasonable particularity or (d) (i) suffers an involuntary petition in bankruptcy to be filed against it, and fails to have such involuntary petition dismissed within sixty (60) days of the petition date (ii) files any petition in any reorganization, arrangement, compromise, readjustment, liquidation, or dissolution or similar relief for itself, or (iii) becomes unable to pay

-1-


EXHIBIT A

-◯- wbsconnect

its debts generally as they become due. In the event of a Customer Default, WBS Connect shall have the right (without any liability, and in its sole discretion) to (a) suspend and/or terminate any or all Services being provided to Customer and/or (b) terminate any or all outstanding CSOs and/or this Agreement. If the Customer Default materially, adversely affects the carrier's network as reasonably determined by WBS Connect, WBS Connect may take such actions immediately and without prior notice to Customer. If the Customer Default does not materially, adversely affect the carrier's network, WBS Connect shall provide adequate written notice (at least two business days) of WBS Connect's intentions to suspend and/or terminate service. Such notice may be provided via electronic mail. If this Agreement is terminated due to a Customer Default, such termination shall not reduce or in any other way affect Customer's remaining minimum monthly commitments required under any CSO for fulfillment of the applicable, then current term(s). WBS Connect shall at all times be entitled to all rights available to it at law and in equity; and, Customer agrees to pay WBS Connect's reasonable expenses (including attorney and collection agency fees) actually incurred in the enforcement of WBS Connect's rights in the event of a Customer Default. If WBS Connect terminates a Service pursuant to this Section 7, WBS Connect may, in its sole discretion, agree to resume the discontinued Service after it is reasonably satisfied Customer has cured the breach(es) which gave rise to WBS Connect's right to suspend the Service. .

8. Taxes and Fees
All charges for Service are exclusive of Applicable Taxes (as defined below). Except for taxes based on WBS Connect's net income, Customer will be responsible for all applicable taxes, fees, surcharges, or other charges or impositions that arise in any applicable jurisdiction, including, without limitation, value added, consumption, sales, use, gross receipts, excise, access, bypass, franchise or other taxes, fees, duties, charges or surcharges, however designated, imposed on, incident to, or based upon the provision, sale or use of the Service or equipment (collectively "Applicable Taxes"). Customer shall pay such undisputed taxes or charges and indemnify WBS Connect from any liability or expense incurred by WBS Connect in connection with such taxes or charges. If Customer is entitled to an exemption from any Applicable Taxes for a particular Service, Customer is responsible for presenting WBS Connect with a valid exemption certificate. WBS Connect will give effect to any such exemption certificate on a retroactive and prospective basis.

9. Regulatory and Legal Changes
In the event of any change in applicable law, regulation, decision, rule or order that materially increases the costs or other terms of delivery of Service, WBS Connect and Customer will negotiate regarding the rates to be charged to Customer to reflect such increase in cost and, in the event that the parties are unable to reach agreement respecting new rates within thirty (30) days after WBS Connect's delivery of written notice requesting renegotiation, then (a) WBS Connect may pass such increased costs through to Customer, and (b) if WBS Connect elects to pass such increased costs through to Customer, Customer may terminate the affected Service without termination liability by delivering written notice of termination no later than thirty (30) days after the effective date of the rate increase, and Customer shall only pay such rate for any Services provided after the rate increase as were in effect prior to the rate increase.

10.  DISCLAIMER OF WARRANTIES
EXCEPT AS EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT, WBS CONNECT MAKES NO WARRANTIES, EXPRESS OR IMPLIED, WHETHER IN FACT OR IN LAW, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OF ERROR-FREE, UNINTERRUPTED OR COMPLETELY SECURE USE . ALL SERVICES PROVIDED PURSUANT TO THIS AGREEMENT ARE PROVIDED AND PERFORMED ON AN "AS IS", "AS AVAILABLE" BASIS, AND CUSTOMER'S USE OF SERVICES IS SOLELY AT ITS OWN RISK.

11.  LIMITATION OF LIABILITIES
IN NO EVENT SHALL EITHER PARTY OR ITS PRINCIPALS, SHAREHOLDERS, OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AFFILIATES, CONTRACTORS, SUBCONTRACTORS, OTHER AGENTS, SUBSIDIARIES OR PARENT ORGANIZATIONS (THE PARTY'S "GROUP") BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE OR ANY OTHER SIMILAR DAMAGES (INCLUDING DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION AND THE LIKE), EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE OR LOSS. WBS Connect shall not be responsible for any liabilities caused by (i) any acts of gross negligence by Customer, any member of Customer's Group or any other third party; (ii) any act by Customer or any member of Customer's Group in violation of Customer's obligations under this Agreement; (iii) any use of the Services by Customer or any member of Customer's Group in violation of this Agreement; and (iv) any modification, addition or alteration to the Services.; and (v) any casualty event out of the control of WBS Connect. Notwithstanding anything to the contrary, in no event shall WBS Connect be liable to Customer, any member of Customer's Group or any other third party for any damages for any cause whatsoever, and regardless of form of action, for any amount which when taken in aggregate with all amounts owed or paid by WBS Connect to Customer or a member of Customer's Group exceeds the highest aggregate amount to be paid by Customer to WBS Connect pursuant to this Agreement.

12.  Compliance with Law
Use of the Services by Customer or any person accessing Services provided Customer shall be in accordance, and comply, with all applicable laws, regulations and rules. Customer shall obtain all approvals, consents and authorizations necessary or advisable to conduct its business and initiate or conduct any transmissions over any facilities covered by this Agreement.

13.  Indemnity
a.   Customer and WBS Connect shall defend, indemnify and hold harmless the other and its respective Group from and against any and all claims for damage to tangible property or bodily injury, including claims for wrongful death, to the extent that such claim arises out of the gross negligence or willful misconduct of the indemnifying party and its respective Group.
b.   Customer will defend, indemnify and hold harmless WBS Connect and its Group from and against any loss, debt, liability, damage, obligation, claim, demand, judgment or settlement of any nature or kind, known or unknown, liquidated or unliquidated, including without limitation, all reasonable costs and expenses incurred including all reasonable litigation costs and attorneys' fees arising out of, resulting from or based upon any complaint, claim, action, proceeding or suit (i) of any third party based upon an alleged defect in or failure of Service, or (ii) arising from or related to Customer's failure to obtain approval, consent or authorization or Customer's violation of any applicable law, rule or regulation.
c.   WBS Connect will defend, indemnify and hold harmless Customer, its managers, members, officers and agents from and against any loss, debt, liability, damage, obligation, claim, demand, judgment or settlement of any nature or kind, known or unknown, liquidated or unliquidated, including without limitation, all reasonable costs and expenses incurred including all reasonable litigation costs and attorneys' fees arising out of, resulting from or based upon any complaint, claim, action, proceeding or suit arising from WBS Connect's failure to comply with the terms of this Agreement and any Cos executed hereunder.

14.  Resale of Services
Customer may resell the Services.

15.  Force Majeure
WBS Connect may adjust or suspend its performance to the extent that such failure to provide Services in accordance to the terms of this Agreement or any applicable CO is due to performance is beyond WBS Connect's reasonable control for reasons including, without limitation, acts of God, fire, explosion, atmospheric conditions such as rain fade, cable cut, governmental action, technological impracticability, national emergencies, war, riot, insurrection, terrorism, vandalism, or labor difficulties such as work stoppages, strikes, or lockouts provided that Customer shall receive a credit to its account for the period that such Services are unavailable.

16.  Confidentiality
a.   Each party hereby acknowledges that, in connection with this Agreement and performance under this Agreement, it may have access to confidential and proprietary material of the other party, its other service providers, carriers, contractors, subcontractors, partners, consultants, employees, or other agents, provided, however, that in no case shall Confidential Information include (i) any information that is or becomes a part of the public domain without breach of a duty of confidentiality; (ii) any information that can definitively evidence was properly in its possession prior to receipt from the other party and is not otherwise subject to a duty of confidentiality; and (iii) any information that a party is under a legal or regulatory duty to disclose to appropriate authorities (in which case, the party shall provide written notice to the other party regarding such duty to disclose as soon as reasonably possible).
b.   Each party shall (i) use Confidential Information only for the purpose of performing obligations under this Agreement; (ii) disclose Confidential

v.082008



-①- wbsconnect

Information only to its employees and agents who have a need to know the Confidential Information in order to assist in performance under this Agreement and ensure that all such employees and agents understand and adhere to all covenants of this Section 15; (iii) take all reasonable steps necessary to hold and maintain the Confidential Information in strict confidence and, except as otherwise provided, in this Section 15, not disclose any Confidential Information to a third party without prior written consent by the other party; (iv) not use any Confidential Information in a way which would be detrimental to the other party; and (v) return all Confidential Information to the disclosing party upon termination of this Agreement.

c. Each party recognizes and agrees that the ascertainment of damages in the event of a breach or threatened breach of any covenant in this Section 15 would be difficult, if not impossible, and further that the various rights and duties created hereunder are extraordinary and unique so that a party will suffer irreparable injury that cannot adequately be compensated by monetary damages in the event of the other party's breach or threatened breach of such covenants. Each party therefore agrees that the other party, in addition to and without limiting any other remedy or right it may have, shall have the immediate right to obtain a preliminary or final injunction against the disclosing party issued by a court of competent jurisdiction enjoining any such alleged breach or violation without posting any bond that might otherwise be required, and each party agrees that it shall not plead the adequacy of any relief at law (including monetary damages) as a defense to the other party's petition, claim or motion for any injunctive relief.

**17. Equipment**

If Customer is provided equipment in connection with the provision of Services, the following provisions shall apply:

a. Customer acknowledges that the equipment is owned by WBS Connect and that the equipment shall, at all times, remain the property of WBS Connect. Customer shall not pledge, lease, sell, transfer, mortgage, otherwise encumber, give away, remove, relocate, attach any electrical or other devices to, alter or tamper with the equipment (or any notice of ownership thereon), without WBS Connect's prior consent. WBS Connect reserves the right to make such filings or take such other actions as WBS Connect, in its sole discretion, deems necessary or appropriate to evidence its ownership rights in the equipment. Customer agrees to execute all documents required to make such filings or accomplish such actions.

b. WBS Connect reserves the right to, at any time, alter the equipment and the features and functionality of the equipment. WBS Connect will use its best efforts to schedule maintenance and replacement of equipment to minimize interference with, or interruption of, Services, but shall have no liability for interruptions in Services arising out of, or related to, maintenance or replacements, provided that Customer receives a credit for the time that Services are unavailable to Customer. WBS Connect may charge Customer for any repairs or replacement required due to damage or misuse of the equipment (normal wear and tear excepted). In addition, if the equipment is defective, damaged, destroyed, tampered with, involved in an accident, stolen or otherwise removed, Customer shall notify WBS Connect immediately and may be held liable for repair or replacement if damage is caused by Customer.

c. Upon termination of Services, Customer will contact WBS Connect to schedule return of the equipment. All equipment must be returned in undamaged and full working order (normal wear and tear excepted). If not returned in such condition, Customer shall pay WBS Connect the actual cost of repair or replacement paid by WBC Connect for such Equipment.

**18. Regulatory Matters**

Customer acknowledges that the Services will be subject to the laws and regulations of multiple jurisdictions. WBS Connect may cancel or suspend any Service, without liability, immediately with commercially reasonable notice to Customer if provision of that Service, or any portion thereof, is determined to be a violation of any applicable law, rule or regulation.

**19. Relationship of Parties**

WBS Connect and Customer are independent contractors and this Agreement will not establish any relationship of partnership, joint venture, employment, franchise or agency between WBS Connect and Customer. Neither WBS Connect nor Customer will have the power to legally bind the other or incur obligations on the other's behalf without the other's prior written consent. Neither WBS Connect nor Customer grants the other the right to use its trademarks, service marks, trade names, logos, copyrights or other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case.

**20. Choice of Law/Venue**

Any disputes concerning this Agreement shall be governed by and determined under Colorado law. Exclusive venue for any disputes arising under this Agreement shall be in Jefferson County, Colorado.

**21. Miscellaneous**

(a) Customer shall not assign or otherwise transfer its rights or obligations under this Agreement without the prior written consent of WBS Connect which consent shall not be unreasonably withheld, except that Customer may so assign without WBS Connect's consent to affiliates and/or as a result of a merger or a sale of substantially all of its assets or capital stock upon commercially reasonable notice to WBS Connect; (b) To the extent otherwise permissible, WBS Connect shall provide Customer the option of assignment of this Agreement directly to the upstream carrier in the event that WBS Connect is unable to continue managing the Services; (c) This Agreement will be binding upon and inure to the benefit of all successors and permitted assigns of the parties, who will be bound by all of the obligations of their predecessors or assignors; (d) WBS Connect will retain title to all parts and materials used or provided by WBS Connect or third parties acting on its behalf in the performance and/or furnishing of the Services; (e) No rule of construction requiring interpretation against the draftsman hereof shall apply in the interpretation of this Agreement; (f) The provisions of this Agreement are for the benefit only of the parties hereto, and no third party may seek to enforce or benefit from these provisions; (g) If any term or provision of this Agreement shall be determined to be invalid or unenforceable by a court or body of competent jurisdiction, then: (1) this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it valid and enforceable while preserving its intent; and (2) the remainder of this Agreement shall be valid and enforceable; (h) The failure of either party to enforce any provision hereof shall not constitute the permanent waiver of such provision; (i) Sections 5, 7, 8, 10, 11, 13, 16, 17, 18, 19 and 20 shall survive any termination of this Agreement; (j) This Agreement, appurtenant schedules, annexes, riders and CSOs constitutes the complete and exclusive statement of the understanding between the parties and supersedes all proposals and prior agreements (oral or written) between the parties relating to the content of this Agreement and the provision of the Services; (k) ) Except where otherwise expressly stated in this Agreement, and subject to the limitations set forth in Section 10, the rights and remedies provided for herein are cumulative and not exclusive of any rights or remedies that a party would otherwise have; (l) Captions and paragraph headings are used merely for reference purposes and do not affect and shall not be interpretative of the context in any manner; (m) This Agreement may be signed in counterparts, each of which when executed, shall be deemed an original, and all such counterparts shall constitute one and the same instrument.

v.082008



-◎- w b s c o n n e c t

*In Witness Whereof,* this Master Services Agreement has been entered into by and between the parties as of the date first written above.

| Customer to complete: | WBS Connect to complete: |
|---|---|
| Customer Name: WV Fiber Acquisition, LLC_____ <br> (Complete Legal Name) | **WBS CONNECT, LLC** |
| Authorized Signature: _[signature]_ | Authorized Signature: _____ |
| Printed Name: _J. Davis_ | Printed Name: _____ |
| Title: _CIO_ | Title: _____ |
| Street address for notices: | Street addresses for notices: |
| _____ | 700 North Colorado Blvd, Suite 307 |
| _____ | Denver, Colorado  80206 |
| Phone: _561 869 6100_ | Phone: 866-927-2699 |
| Facsimile number: _561 869 5320_ | Facsimile number: 720-528-7849 |
| Electronic mail address: _JDavis@wvfib.net_ | Electronic mail address: usage@wbsconnect.com |

-⊕- w b s c o n n e c t

*Annex A*

## Process and Installation Terms

This document contains process and installation terms and conditions. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed in the Master Service Agreement dated as of $\underline{Sept\ 1}$, 20$\underline{08}$ by and between WBS Connect, LLC ("WBS Connect") and WV ACQUISTION, LLC ("Customer")_____

### Abbreviations and Definitions
*CAS:*  *Circuit Activation Summary* - Start of service notification document issued by WBS Connect to Customer indicating installation is complete. A CAS is also issued upon a CNR designation.
*CNR:*  *Customer Not Ready* - Status designation indicating a failure by Customer to complete a required step in the installation procedure.
*DLR:*  *Design Layout Record* - Document issued by local access and/or IXC provider indicating facilities used in local access design.
*LOA/CFA: Letter of Authorization/Carrier Facility Assignment* - Document issued by WBS Connect (or a third party) to Customer authorizing Customer to order cross connect with specific vendor and also containing specific assignment on WBS Connect controlled facilities.
*MRC:*  *Monthly Recurring Charge* - Amount to be paid on a per month basis to WBS Connect by Customer for Services. MRC billing will commence as of the date Services are available for use by Customer.
*OCL:*  *Order Confirmation Letter* - Document issued by WBS Connect to Customer confirming receipt of order and containing WBS Connect order number and other pertinent circuit information.
**Provisioner:**   WBS Connect installation coordinator who facilitates installation between Customer and carrier.
**Provisioning Document:** Document setting forth technical specifications for installation and operation.

### Order Confirmation Letter
WBS Connect will issue Customer an OCL and a form of Provisioning Document upon completion of an order entry into the WBS Connect ordering system. The form of Provisioning Document must be completed and returned by Customer within 15 days of receipt of the form commencing on the earliest of the following: 1) after the carrier neutral collocation facility has completed cross connect, or 2) Service has been commenced. If Customer fails to complete and return the Provisioning Document within such 15-day period, WBS Connect will designate the order CNR. Upon making such designation, a CAS will be issued to Customer. MRC billing will commence as of the date of the designation. WBS Connect will continue to work with Customer to complete the installation.

### Implementation Intervals
Intervals are dependent on the product type ordered. The WBS Connect sales representative will use their best efforts to ensure service is ordered as ONNET with the appropriate upstream carrier based on price-points, capacity, and overall service application needs. The service implementation interval will not begin until the Provisioner receives a completed Provisioning Document, which will be sent after issuance of the OCL. Should any information be missing or incorrect, the Provisioner will work with sales representative and Customer to immediately obtain the necessary items.

### CFA/LOA Issuance
The LOA/CFA will be issued once the order has been designed and is ready for cross connect placement. Customer will be responsible for ordering cross-connect and all associated costs. Customer agrees to order cross connect within five (5) business days of the OCL. MRC billing will commence as of the date of the designation. WBS Connect will continue to work with Customer to complete the installation.

### Installation
Once the pre-testing has been completed, a turn up date will be scheduled with Customer and the carrier hosted by the Provisioner. If Customer ordered third party services, it is the responsibility of Customer to contact the Provisioner to test and turn up the service on the turn up date scheduled. All arrangements for changes regarding the installation of services must be made through the Provisioner at least two (2) business days prior to the turn up date. If circuit installation or test is requested to be performed outside of normal business hours (M-F, 8 a.m. – 6 p.m. MST), Customer must coordinate with WBS Connect service delivery support or Provisioner at least 48 hours in advance.



**Customer Ready**
On the designated FOC date/scheduled turn up date, the Provisioner will contact Customer to perform end-to-end testing. Upon completion of successful testing, start of service will commence and a CAS will be issued to Customer. MRC billing will commence as of the date of such completion.

wbsconnect

**Customer Not Ready**
On the designated turn up date, the Provisioner will contact Customer to perform end-to-end testing. In the event the Provisioner is unable to reach Customer's technician or if Customer is not ready to test end-to-end on the designated turn up date, WBS Connect will designate the order CNR. Upon making such designation, a CAS will be issued to Customer. MRC billing will commence as of the date of the designation. WBS Connect will continue to work with Customer to complete the installation.





# Customer Service Order

August 29, 2008

## General Order Details

| Quote Date: | August 29, 2008 | Carrier | Sprint / WBS Connect |
|---|---|---|---|
| Account Rep: | Hollander | WBS Customer ID # | See Below |
| Agent: | | Former Customer WBS ID # | |

| Customer Information and 24/7 Technical Contact | | | Billing Information<br>(If different than address provided in MSA) | |
|---|---|---|---|---|
| Company Name: | WV Fiber Acqusition, LLC. | | | |
| Installation Address: | 3500 NW Boca Raton Blvd. Suite 901 | | Address: | 3500 NW Boca Raton Blvd. Suite 901 |
| City, State, Zip: | Boca Raton, FL 33431 | | City, State, Zip: | Boca Raton, FL 33431 |
| Technical Contact: | Randy Epstein | | Billing Contact: | Cathy Davis |
| Phone: | 561-569-3322 | | Phone: | 561-869-3312 |
| Fax: | 561-869-3320 | | Fax: | 561-869-3320 |
| Email: | repstein@wvfiber.com | | Email: | cdavis@hosl.net |

Product Description, Initial Term & Charges

| Product | Requested Install Date | Initial Term | Price Per Product | Min Committed Data Amnt | Monthly Recurring Charge | Non-Recurring Set Up Charge |
|---|---|---|---|---|---|---|
| WVFISPR0111GR1A | Installed | 24 months from the date of installation completion or CNR designation (as provided in the Additional Terms and Conditions) | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR0111GR1C | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR0121711A | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR0121712A | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR01350C1A | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR01350C1C | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR01350C2A | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR0156MA1A | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR0156MA2A | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR01624S1A | Installed | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| HOSTWBS0149TH1D | Installed | Existing Term | N/A | 10 Mb's | $850.00 | $0.00 |
| WVFIWBS01624S1D | 09/06/2008 | Contracted Term | N/A | 100 Mb's | $2,535.00 | $500.00 |
| WVFIVRZ0121W41D | 10/31/2008 | Contracted Term | N/A | 100 Mb's | $2,281.00 | $1,000.00 |
| HOSTWBS0135SA1D | 09/15/2008 | Contracted Term | N/A | 10 Mb's | $1,250.00 | $1,000.00 |
| WVFISPR01624S3C | N/A | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR0111181C | N/A | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| WVFISPR0150NE1C | N/A | | $11.86 | 200 Mb's | $2,372.00 | $0.00 |
| Totals | 10/01/2008 | 24 months from the date of installation completion or CNR designation (as provided in the Additional Terms and Conditions) | $11.86 | 10,000 Mb's | $37,752.00 | $500.00 |

The Initial Payment due and payable upon execution of this Customer Service Order by Customer is $38,252.00 (comprised of the Non-Recurring Set Up Charge set forth above and the first month's Monthly Recurring Charge).



— ⓘ — wbsconnect

Additional Installation and Setup Instructions & Information

- This will be 10 individual GE's of Sprint each with 200 Mb's committed. These circuits are installed and in production.
- Burst on all GE's of Sprint will be billed at $11/Mb.
- The Layer 3 IP Transit Contract will be billed on an Aggregate billing model.
- This will be for one transport circuit that is installed and 3 transport circuits that are pending install.
- This will be a new 200 Mb's committed on a GE in 624 S. Grand, 4th floor MMR, Los Angeles, CA 90013
- This will be a new 200 Mb's committed on a GE in 50 NE 9th, in the MMR, Miami, FL 33132.
- This will be a new 200 Mb's committed on a GE in 111 8th Avenue, suite 518c (Switch and Data) New York, NY 10011.
- Each additional GE of Sprint will be bill at $11.86 on the first 200 Mb's of committed traffic and $11.00/Mb for the burst traffic over 200 Mb's.
- Per the MSA, if WBS Connect should go out of business, Customer would transition to a direct Sprint relationship.
- For all ports, Customer will be responsible for ordering cross-connect and all associated costs.
- For all new ports once LOA/CFA is issued, Customer has 10 Business days to complete cross connect before billing begins.
- Typical install time 4-5 weeks from contract signing.   15 ℓ

This Customer Service Order No. ___ is executed pursuant to, and in accordance with, the Master Service Agreement ("MSA") dated as of August 29, 2008 by and between WBS Connect, LLC ("WBS Connect") and WV FIBER ACQUISITION, LLC ("Customer"), and is subject to all non-conflicting terms and conditions of the MSA, the Colocation Rider (as defined in the MSA) or the Additional Terms and Conditions (as defined in the MSA). To the extent that terms or conditions of this Customer Service Order conflict with terms or conditions of the MSA, the Colocation Rider or the Additional Terms and Conditions, the terms and conditions of this Customer Service Order shall govern unless, and only to the extent, expressly provided otherwise in the MSA, the Colocation Rider or the Additional Terms and Conditions, as the case may be. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed in the MSA.

Effective Date; Terms; Termination

This Customer Service Order shall be immediately effective and binding upon execution by both parties as evidenced below. There shall be a separate term for each product covered by this Customer Service Order. The initial term for each product shall be as specified above and the initial term for each respective product shall automatically terminate at the end of such initial term, unless either party gives written notice to the other party of renewal of the product at least sixty (60) days but not more than ninety (90) days before the end of the applicable term for that product. Unless earlier terminated in accordance with the terms and conditions of the MSA, this Customer Service Order shall remain in effect until expiration of all terms for all products covered by this Customer Service Order. Upon expiration of all terms for all products covered hereby, this Customer Service Order shall automatically terminate.

In Witness Where of, this Customer Service Order has been entered into by and between the parties.

Customer to complete:                                                WBS Connect to complete:

Customer Name: WV FIBER ACQUISITION, LLC
                (Complete Legal Name)

Authorized Signature: _____      Authorized Signature: _____

Printed Name: _____J. Dave_____         Printed Name: _____

Title: _____CEO_____            Title: _____

Date Signed: _____9/1/08_____          Date Signed: _____



**Remittance address:**
Dept 2341
PO Box 122341
Dallas TX 75312-2341
Toll free:    1-866-WBSConx (866-927-2669)
accountsreceivable@wbsconnect.com
720-259-8363

# Invoice
Invoice Number:
*080109*
Invoice Date:
**August 1, 2009**

**Sold to:**
WV Fiber
2159 Utopia Ave
Nashville, TN 37211

IF YOU ARE EXPERIENCING ANY PROBLEMS WITH YOUR SERVICE, PLEASE CONTACT US AT ...... noc@wbsconnect.com

| Customer Number: WVF100 | Charges for the service period of: Sep-09 | | Payment Terms | |
|---|---|---|---|---|
| Sales Rep 0001 | Install date Various | | | |
| Description | | Quantity | PPMb | extension |
| 1  1000809  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR0111GR1C | | 200 | | |
| 2  1000808  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR01350C3A | | 200 | | |
| 3  1000805  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR0156MA2A | | 200 | | |
| 4  1000974  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR01624S1A | | 200 | | |
| 5  1000264  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR0121711A | | 200 | | |
| 6  1000287  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR0156MA1A | | 200 | | |
| 7  1000325  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR01350C1A | | 200 | | |
| 8  1000807  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR01350C2A | | 200 | | |
| 9  1001235  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR0111181A | | 200 | | |
| 10  1001236  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR0150NE1A | | 200 | | |
| 11  1001241  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR01624S3A | | 200 | | |
| 12  1001447  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR01624S2A | | 200 | | |
| 13  1001446  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR0156MA3A | | 200 | | |
| 14  1001445  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR01350C4A | | 200 | | |
| 15  1001477  Pre-bill for service period  09/1/09 - 09/30/09 WVFISPR0156MA4A | | 200 | | |
| | Total Commit | 3000 | 11.86 | $ 35,580.00 |
| Burst | Actual usage | Mb commit | Burst Mb | Burst rate | extension |
| 1  1000264  Usage 06/01/09 - 06/30/09 WVFISPR0121711A | 172.22 | 200 | | | |
| 2  1000287  Usage 06/01/09 - 06/30/09 WVFISPR0156MA1A | 344.05 | 200 | | | |
| 3  1000325  Usage 06/01/09 - 06/30/09 WVFISPR01350C1A | 473.57 | 200 | | | |
| 4  1000805  Usage 06/01/09 - 06/30/09 WVFISPR0156MA2A | 342.29 | 200 | | | |
| 5  1000807  Usage 06/01/09 - 06/30/09 WVFISPR01350C2A | 477.77 | 200 | | | |
| 6  1000808  Usage 06/01/09 - 06/30/09 WVFISPR01350C1C | 476.9 | 200 | | | |
| 7  1000809  Usage 06/01/09 - 06/30/09 WVFISPR0111GR1C | 63.77 | 200 | | | |
| 8  1000974  Usage 06/01/09 - 06/30/09 WVFISPR01624S1A | 406.41 | 200 | | | |
| 9  1001235  Usage 06/01/09 - 06/30/09 WVFISPR011181A | 196.23 | 200 | | | |
| 10  1001236  Usage 06/01/09 - 06/30/09 WVFISPR0150NE1A | 66.77 | 200 | | | |
| 11  1001241  Usage 06/01/09 - 06/30/09 WVFISPR01624S3A | 397.66 | 200 | | | |
| 12  1001445  Usage 06/01/09 - 06/30/09 WVFISPR01350C4A | 408.4 | 200 | | | |
| 13  1001446  Usage 06/01/09 - 06/30/09 WVFISPR0156MA3A | 238.8 | 200 | | | |
| 14  1001447  Usage 06/01/09 - 06/30/09 WVFISPR01624S2A | 0 | 200 | | | |
| 15  1001477  Usage 06/01/09 - 06/30/09 WVFISPR0156MA4A | 233.9 | 200 | | | |
| Total Usage | 4298.74 | 3,000 | 1,298.74 | 11.00 | $ 14,286.14 |

| Domestic Wire Info: | International Wire INFO: | | |
|---|---|---|---|
| TO: Silicon Valley Bank San Jose | Pay To: Silicon Valley Bank | Subtotal | $  49,866.14 |
| Routing and Transit#: 121140399 | 3003 Tasman Drive, Santa Clara , CA 95054, USA | Total | $  49,866.14 |
| For Credit of Credit of WBS Connect Inc. | Routing and Transit: #121140399 | | |
| Credit Account #3300603976 | Swift Code: SVBKUS6S | | |
| By Or Of: (Name of Sender) | For Credit Of: Credit of WBS Connect Inc | | |
| | Credit Account# 3300603976 | | |



EXHIBIT B



# SHRAIBERG, FERRARA & LANDAU P.A.

**Reply to**
Lenore M. Rosetto
Tel. (561) 443-0800
Direct Line: (561) 443-0818
Fax (561) 998-0047
Email: lrosetto@sfl-pa.com

September 27, 2009

To whom it may concern,

On September 27, 2009, debtor, WVF Acquisition, LLC (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), Case No. 09-30483-EPK. Pursuant to section 362(a) of the Bankruptcy Code all collection remedies and any attempt to collect a debt from the Debtor must stop.

Please be advised that any action taken against the Debtor or its property without first obtaining relief from the automatic stay from the Bankruptcy Court may be subject to findings of contempt and the assessment by the Bankruptcy Court of penalties, fines and/or sanctions, as may be appropriate.

Please govern yourself accordingly,

Lenore M. Rosetto


EXHIBIT C

**From:** Mike Hollander [mailto:mike@wbsconnect.com]
**Sent:** Sunday, September 27, 2009 5:34 PM
**To:** Jeffrey Davis
**Cc:** 'Scott Charter'; 'Andrew Sobczyk'
**Subject:** Re: WV Fiber Notice of Bankruptcy

Obviously we are sorry to see this.  Trust you are making the best of a bad situation.  Please set some time aside tomorrow to speak on the phone.  Have a good Sunday.

Michael Hollander
Managing Partner
(303)731-0059 Direct
(720)629-6180 Mobile
(720)221-0688 eFax

www.wbsconnect.com
www.wbstoday.com blog
mikethollander AIM/Yahoo
michaelhollander@hotmail.com MSN
http://twitter.com/wbsconnect


*Inc 500 Ranked #6 for IT Services in 2009.*
*Inc 500 Ranked #108 US private companies.*



On Sep 27, 2009, at 3:25 PM, Jeffrey Davis wrote:


Please see attached.

Please feel free to contact either of the two below attorneys with any questions:

Associate Attorney: Lenore M. Rosetto: lrosetto@sfl-pa.com
Lead Attorney: Bradley Shraiberg: bshraiberg@sfl-pa.com


9/28/2009

Accordingly the monies previously discussed will not be sent on Monday/Tuesday.

If you would like to speak to me, that would also be acceptable.

-
jeff

---
Jeffrey A. Davis
Chairman & CEO
Host.net & WV Fiber
jdavis@host.net / jdavis@wvfiber.com
www.host.net / www.wvfiber.com
<image001.jpg>
The information contained in this transmission is intended only for the individual to whom or entity to which it is addressed. It may also contain privileged, confidential, attorney work product or trade secret information which is protected by law. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering the message to the addressee, the reader is hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone or return electronic mail


<Letter giving notice of bankruptcy.pdf>

9/28/2009