

**ORDERED in the Southern District of Florida on December 02, 2009.**

Erik P. Kimball, Judge
United States Bankruptcy Court

___

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| **In re:** | **Case No.: 09-30483-EPK** |
| **WVF Acquisition, LLC** | **Chapter 11** |
| **f/k/a WV Fiber Acquisition, LLC,** | |
|     **Debtor.** | |
| _____/ | |

**MEMORANDUM OPINION AND ORDER GRANTING SANCTIONS**
**FOR WILLFUL VIOLATION OF THE AUTOMATIC STAY**

**THIS MATTER** came before the Court for emergency preliminary hearing on September 30, 2009, and for evidentiary hearings on October 19, 2009 and November 13, 2009, upon the *Emergency Motion for Contempt for Violation of the Automatic Stay* [DE 15] (the "Motion") filed by WVF Acquisition, LLC f/k/a WV Fiber Acquisition, LLC (the "Debtor"). The Court considered the Motion, the *Memorandum in Support of Request for Punitive Damages Sought in the Debtor's Emergency Motion to Hold WBS Connect, LLC in Contempt for Violation of the Automatic Stay [D.E. #15]* [DE 53] filed by the Debtor, the *Memorandum in Opposition to*

*Bankruptcy Court's Authority to Award Corporate Debtor Punitive Damages Pursuant to Section 362 of the Bankruptcy Code* [DE 57] filed by WBS Connect, LLC ("WBS"), the evidence admitted at the hearings on the Motion, and the presentations of counsel, and is otherwise fully advised in the premises. This Memorandum Opinion and Order sets forth the Court's findings of fact and conclusions of law.

This matter presents the somewhat controversial question of whether the bankruptcy court may award punitive damages for violation of the automatic stay in a case involving a corporate debtor. For the reasons stated below, the Court determines that it has the power to award punitive damages and that punitive damages are warranted in this case. The Court awards against WBS in favor of the Debtor compensatory damages in the amount of $51,995.00 and punitive damages in the amount of $50,000.00, for a total of $101,995.00.

### JURISDICTION AND DETERMINATION OF CORE PROCEEDING

The Court has jurisdiction over the Motion under 28 U.S.C. § 1334(b). The Court has the power to enter this Order pursuant to 28 U.S.C. § 157 and the standing order of reference in this District. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O), and because the relief requested is "integrally involved in the bankruptcy court's authority to enforce its own orders." *Thigpen v. Matrix Fin. Servs. Corp. (In re Thigpen)*, No. 04-01035, 2004 Bankr. LEXIS 1136, at *8 (Bankr. S.D. Ala. Aug. 2, 2004) (citing *Dunmore v. United States*, 358 F.3d 1107, 114-15 (9th Cir. 2004)).

### FINDINGS OF FACT

The Debtor is a communication and information services company that provides internet

access to customers in North America and Europe. The Debtor purchases dedicated internet access from WBS, which in turn secures internet access through Sprint Nextel Corporation ("Sprint"). The Debtor depends on the service provided by WBS to provide service to tens of thousands of direct and indirect customers of the Debtor.

Shortly after the commencement of this case, WBS terminated all internet service to the Debtor, bringing the Debtor's business to a halt. The Debtor alleges that this was a willful violation of the automatic stay in flagrant defiance of the law. After an emergency preliminary hearing on September 30, 2009, the Court entered its *Order Granting Debtor's Emergency Motion for Contempt for Violation of the Automatic Stay* [DE 32], in which the Court found, *inter alia*, that the Debtor's service contract with WBS is a valuable asset of the Debtor's estate and termination of service under the contract represented a violation of the automatic stay under 11 U.S.C. § 362(a). On October 19, 2009, the Court held an evidentiary hearing on the Motion. At that hearing, the Debtor presented evidence on the damages it claims resulted from the termination of its internet service by WBS. Counsel for WBS requested a continued evidentiary hearing to allow WBS to present contrary evidence, and counsel for WBS consented to the Debtor presenting additional evidence of its own at such continued evidentiary hearing. Consequently, the Court held a second evidentiary hearing on the Motion on November 13, 2009.

The Debtor is a wholly owned subsidiary of Broadband One d/b/a Host.net ("Broadband One"). In July 2008, Broadband One used the Debtor to acquire substantially all of the assets of, and assume certain liabilities of, WV Fiber Acquisition, LLC ("WVFA"). The assumed liabilities included certain debts of WVFA to WBS.

Prior to the Debtor's acquisition of WVFA, WBS and WVFA were parties to a certain

Master Services Agreement (the "MSA") governing provision of services by WBS to WVFA and payment by WFVA to WBS for such services. Jeffrey Davis, the chief executive officer of the Debtor's sole member, Broadband One, testified that when the Debtor acquired WVFA it assumed WVFA's financial obligations to WBS. The amount of the assumed debt is not clear from the record, but it appears to have been at least $60,000.00. Consistent with the terms of the MSA, WBS invoices the Debtor on a monthly basis for a monthly access fee paid in advance plus fees for excess bandwidth usage calculated based on a prior month's usage by the Debtor. The Debtor and WBS continue to operate under the terms of the MSA.

During the year prior to the petition commencing this case, the Debtor and WBS had ongoing disputes regarding amounts owed by the Debtor to WBS and also regarding amounts owed by WBS to the Debtor under separate service arrangements. Michael Hollander, a principal of WBS, testified that during their negotiations the Debtor repeatedly threatened to file bankruptcy. Mr. Davis testified that WBS repeatedly threatened to disconnect the Debtor's internet service through WBS.

As of September 22, 2009, the Debtor owed WBS $90,000.00. On that date, WBS agreed not to disconnect the Debtor's service if the Debtor paid $60,000.00 that same day and an additional $30,000.00 on September 28, 2009. The Debtor paid WBS $60,000.00 on September 22, 2009.

On Sunday, September 27, 2009, the day before it was to pay the remaining $30,000.00 to WBS, the Debtor filed a chapter 11 petition with this Court commencing the present case. The Debtor filed this case specifically to avoid service termination by WBS. At 3:25 p.m. Eastern Time on September 27, 2009, Mr. Davis sent to WBS, via electronic mail, a copy of a letter from the Debtor's counsel on firm letterhead stating that the Debtor "filed a voluntary

petition for relief under Chapter 11 of the United States Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), Case No. 09-30483-EPK." The letter also stated as follows:

> Pursuant to section 362(a) of the Bankruptcy Code all collection remedies and any attempt to collect a debt from the Debtor must stop. Please be advised that any action taken against the Debtor or its property without first obtaining relief from the automatic stay from the Bankruptcy Court may be subject to findings of contempt and the assessment by the Bankruptcy Court of penalties, fines and/or sanctions, as may be appropriate.

Mr. Hollander of WBS responded by electronic mail at 5:34 p.m. Mountain Time, stating: "Obviously we are sorry to see this. Trust you are making the best of a bad situation. Please set some time aside tomorrow to speak on the phone. Have a good Sunday." That night, starting between 2:00 a.m. and 3:00 a.m. Eastern Time on Monday, September 28, 2009 and continuing through about 8:00 a.m. Eastern Time, WBS shut off all service to the Debtor.

Mr. Hollander testified that when he received the letter from the Debtor's counsel informing WBS of the filing of this case, he did not believe the Debtor had actually filed. Mr. Hollander testified that Mr. Davis had threatened on numerous occasions that the Debtor would file bankruptcy. Mr. Hollander testified that after receiving the letter from Debtor's counsel he did a Google search to see if he could find word of a bankruptcy filing by the Debtor, and seeing none concluded the letter was yet another threat from the Debtor. Mr. Hollander's testimony on this point was not credible. Even if his testimony had been sincere, Mr. Hollander's conclusion was not reasonable under the circumstances. A letter from a law firm on firm letterhead stating that it represents a debtor, announcing the filing of a bankruptcy petition, including the case number, and reminding the creditor of the effect of the automatic stay, is markedly different from a mere threat to file a bankruptcy. After receiving that letter from counsel to the Debtor, without appropriate investigation WBS could not reasonably question the pendency of the present

5

chapter 11 case.

Early on Monday afternoon, September 28, 2009, counsel for WBS forwarded to the Debtor's counsel via electronic mail a form of general release for execution by the Debtor. The electronic mail message included a forwarded message from Scott Charter, also a principal of WBS, who made the following statement: "Once I see signed release from WVF, we will turn back on." Mr. Hollander, testifying on behalf of WBS, stated that the Debtor's signing a release was not a condition to WBS restoring the Debtor's internet service, and that WBS had already initiated service restoration by the time the form of release was sent to the Debtor's counsel. Mr. Hollander's testimony on this issue was not credible. It is clear that by Monday afternoon WBS was aware it had violated the automatic stay and, to make matters worse, was attempting to leverage a general release from the Debtor.

WBS knew full well how its actions would affect the Debtor. Mr. Hollander testified that the industry in general is very close knit and that he is intimately familiar with the Debtor's business. There is no doubt that WBS intended to bring the Debtor to its knees. The service outage affected 15 of the Debtor's circuits, stopping all internet traffic through the subject circuits. The Debtor's primary business came to a standstill. Some circuits were brought back up late on Monday morning, after about 8 hours down. Other circuits remained out through late on Tuesday, September 29, 2009, in some cases for nearly 36 hours. The Debtor had never previously experienced a material downtime. As a result of the service outage, the Debtor agreed to issue customer credits equal to $18,720.00. In light of Mr. Berenko's testimony at the initial evidentiary hearing that the potential customer credits could amount to as much as $450,000.00, the Debtor contained this component of damages as much as can be expected.

The Debtor maintains a "WV Fiber Backbone Network Service Level Agreement" (the

"SLA"), defining certain service parameters for its customers. The SLA is not executed by the Debtor's customers. There is no signature space provided on the document. It is provided to customers as part of the documentation for service from the Debtor. WBS argued that under section 8 of the SLA, to receive a credit the Debtor's customers must provide written notice within 7 days after the end of the month in which the service outage occurred. WBS argued that the Debtor presented no written requests from customers satisfying this provision, implying that the customer credits agreed to by the Debtor were unwarranted. The Debtor argued that the outage caused by WBS was a "Network Outage" subject to credit under section 4 of the SLA rather than a "Latency or Packet Loss" subject to the written notice provisions of section 8 of the SLA. Roger Berenko, the Debtor's Vice President of Operations, testified credibly that the Debtor was required to provide customer credits in order to preserve its reputation in the industry and to prevent customer defections, whether or not there was a specific contractual requirement. In closing argument, counsel for WBS conceded that the Debtor had no choice but to provide customer credits under the circumstances. The Court finds that the customer credits agreed to by the Debtor were a direct and foreseeable consequence of the actions of WBS.

The Debtor claims damages for legal fees and related expenses in connection with filing and prosecuting the Motion. WBS argues that the Motion was not necessary, that WBS was in the process of restoring service when the Motion was filed, and that service was fully restored before the first evidentiary hearing on the Motion. Indeed, service restoration was ongoing at the time of the emergency preliminary hearing. But this was not the only goal of the Motion. Once WBS terminated the Debtor's service post-petition, the Debtor had a right to pursue a ruling from this Court regarding the willfulness of WBS's action and whether damages should be awarded. The Debtor properly pursued the Motion in an efficient and expeditious manner. As a

result of WBS's actions, the Debtor was forced to incur legal fees of its state court counsel, who represented the Debtor in connection with this matter when the Debtor's primary bankruptcy counsel was unavailable due to a religious holiday. State court counsel's fees amount to $3,300.00. The Debtor's primary bankruptcy counsel presented time records aggregating $24,975.00 for legal fees in connection with bringing the Motion through November 12, 2009. The Debtor's bankruptcy counsel estimated an additional $5,000.00 in fees through the second day of evidentiary hearing and the Court finds this estimate reasonable. In the aggregate, the Debtor incurred legal fees of $33,275.00 in presenting the Motion. The Court finds that these legal fees were a direct and foreseeable consequence of the actions of WBS.

The Debtor argued that as a result of the actions of WBS the Debtor will be forced to abandon its relationship with WBS and switch to direct service with Sprint. Mr. Davis testified that the Debtor does not trust WBS, that the service shut-down has left a "sour taste" in his mouth, and that the Debtor is unwilling to put its customers at risk by remaining with WBS. The Debtor offered testimony of Mr. Davis and of the Debtor's Director of Engineering, Rory Case, regarding the costs of switching from WBS to Sprint. They estimated the cost at about $20,000.00. (During argument on the second day of evidentiary hearing counsel for the Debtor stated that the cost would be $19,315.00, but the record does not support such an exact figure.) It is not surprising that the Debtor is unhappy with WBS's actions. However, the Debtor conceded that the service provided by WBS was without incident before WBS took down the Debtor's service on September 28, 2009, and has been without incident since service was restored. The evidence presented does not support a conclusion that the need to substitute service providers is a direct and necessary consequence of the service outage caused by WBS.

The Debtor alleged that it suffered additional damage as a result of the Debtor's

principal, Mr. Davis, and others having to spend a great deal of time on September 28 and 29, 2009, attempting to restore service through WBS. Mr. Davis testified credibly that there were over 100 man hours spent attempting to resolve the service outage, that he personally devoted the entire day on Monday, September 28th to the issue, and that the actions of WBS caused several major staff members to focus their attention away from their regular duties in order to assist with restoring service. Mr. Davis also testified that he was required to attend three hearings on the Motion. The Debtor offered no evidence of the value of Mr. Davis's time or that of his colleagues. As a result, the Court is not able to award damages for this component of the Debtor's claim.

With regard to the ability of WBS to pay a damages award, including punitive damages, the evidence presented shows that WBS generates approximately $28 million in annual revenue and has positive earnings before interest, taxes, depreciation, and amortization. WBS is expected to be acquired by a larger company, Global Telecom & Technology, for consideration including shares of stock in the acquiring company, $1.8 million in cash and seller notes, and the assumption of WBS liabilities. From this the Court concludes that WBS is able to pay the amount awarded in this Memorandum Opinion and Order both before and after the planned acquisition.

The Court finds that the Debtor proved all relevant facts beyond a reasonable doubt.

## CONCLUSIONS OF LAW AND ANALYSIS

The actions of WBS in terminating the Debtor's internet service immediately after the filing of this case, and in attempting to strong-arm a general release from the Debtor, constitute obvious violations of the automatic stay imposed under 11 U.S.C. § 362(a). As an international

9

communication and information services company, the Debtor's agreement with WBS for provision of internet service is a valuable asset of the estate. Through its arrangement with WBS, the Debtor provides service to tens of thousands of direct and indirect customers. Based on the evidence presented, WBS's termination of service and attempt to obtain a general release were acts to obtain possession or control over property of the estate in violation of section 362(a)(3) and acts to recover on a pre-petition claim in violation of section 362(a)(6). WBS did not contest that it violated the stay, but instead focused on whether damages should be awarded. The Court set the evidentiary hearings to address the Debtor's request for compensatory and punitive damages.

Damages may be awarded for violation of the automatic stay when the violation is "willful." *Jove Eng'g, Inc. v. IRS,* 92 F.3d 1539, 1555 (11th Cir. 1996) (citations omitted). A violation of the automatic stay is "willful if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." *Id.* (citing cases in other circuits). The requirement that the violator knew of the automatic stay does not mean that the violator need be aware of the provisions of section 362. It is sufficient that the violator had actual knowledge of the bankruptcy case, *Randolph v. IMBS, Inc.*, 368 F.3d 726,728 (7th Cir. 2004), or "notice of sufficient facts to cause a reasonably prudent person to make additional inquiry to determine whether a bankruptcy petition has been filed." *Sansone v. Walsworth (In re Sansone)*, 99 B.R. 981, 984 (Bankr. C.D. Cal. 1989) (citation omitted).

The applicable standard of proof, at least with regard to compensatory damages, is clear and convincing evidence. *Jove Eng'g, Inc.*, 92 F.3d at 1545. The standard of proof may be higher than clear and convincing evidence when the Court considers an award of punitive

damages.  *Id.* (citation omitted).  As noted above, the Court finds that the Debtor proved all relevant facts beyond a reasonable doubt.

In this case, prior to shutting down the Debtor's internet service, WBS received a letter from Debtor's counsel on firm letterhead announcing the filing of this chapter 11 case and providing the case number.  Although not necessary to a finding that WBS's actions were willful, the letter specifically implicated the provisions of the automatic stay.  A principal of WBS acknowledged receipt of the letter, in writing, prior to WBS terminating the Debtor's internet connection.  Other than a certified copy of the petition itself, it is hard to imagine better notice of a bankruptcy filing.  In response, WBS offered Mr. Hollander's testimony that based on the Debtor's prior threats to file bankruptcy WBS did not believe the Debtor had actually filed.  First, the subjective belief of WBS and its principals is not relevant.  *Jove Eng'g, Inc.*, 92 F.3d at 1555 (citing *Howard Johnson Co. v. Khumani,* 892 F.2d 1512, 1516 (11th Cir. 1990)).  Second, even if the Court were to consider Mr. Hollander's statements, his testimony was not credible on this issue.  Third, even if Mr. Hollander's testimony had been believable, after receiving the letter from Debtor's counsel WBS had a duty to investigate whether the Debtor had in fact filed a bankruptcy petition before taking any action against the Debtor.  It was not reasonable for WBS to rely solely on an internet search via Google for this purpose.  There is no question that WBS intended to shut down the Debtor's internet service.  Thus, as WBS knew of the existence of the stay and intentionally acted in contravention of its requirements, the Court finds that WBS acted willfully in violating the automatic stay in this case and is in contempt of court.

The willful violation of the stay by WBS caused damage to the Debtor.  As a result of WBS shutting down the Debtor's internet service, the Debtor was unable to provide service to its own customers for a period of 8 to 36 hours depending on the geographic location.  In a

11

reasonable attempt to maintain the Debtor's reputation and goodwill and to retain its customers, and consistent with the Debtor's written policy, the Debtor agreed to issue customer credits in the aggregate amount of $18,720.00.  Based on the evidence presented, these customer credits constitute actual damages to the Debtor as a direct result of WBS's actions.

In filing and prosecuting the Motion the Debtor incurred legal fees aggregating $33,275.00.  Although not necessarily required in this context, the Court considered such fees in light of the criteria set forth in *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1299 (5th Cir. 1977) and *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974)*, abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989), and finds such fees are reasonable under the circumstances.

As addressed above, the Debtor desires to switch service from WBS to Sprint and requests damages for the related cost.  The evidence presented does not support a conclusion that the cost of such undertaking is a necessary consequence of the automatic stay violation in this case.  Thus, the Court awards no damages for this component of the Debtor's claim.

The Debtor requested damages for time spent by Mr. Davis and the Debtor's employees in responding to the service interruption caused by WBS.  The Debtor directs the Court to *In re Dynamic Tours & Transp., Inc*., 359 B.R. 336, 344 (Bankr. M.D. Fla. 2006), where the bankruptcy court awarded damages of $10,000.00 for time spent by the debtor's principal as a result of a creditor's violation of the discharge injunction.  The Debtor asks this court to adopt the same $10,000.00 award in the present matter.  One assumes that the court in *Dynamic Tours* had some evidence on which to base its award.  Here, the Debtor offered no evidence of the value of Mr. Davis's time, or that of his colleagues, on which this Court may determine proper damages.  The Court is unwilling to set a seemingly random value for this component of

damages and thus awards none.

Based on the foregoing, under both the Court's inherent contempt power and under section 105, the Court will award compensatory damages to the Debtor for the willful violation of the automatic stay by WBS in the aggregate amount of $51,995.00.

The Debtor also requests that the Court award punitive damages against WBS. This raises two questions—first, whether this Court has the power to award punitive damages under the circumstances and, second, whether the facts in this case support an award of punitive damages and in what amount.

Nearly every recent decision in the 11th Circuit addressing a request for punitive damages, in the context of violations of the automatic stay, violations of the discharge injunction, and in similar circumstances, cites *Jove Eng'g, Inc. v. IRS,* 92 F.3d 1539 (11th Cir. 1996). Some opinions cite *Jove* for the proposition that the court may award punitive damages under section 105. *See, e.g.*, *Walton v. Countrywide Home Loans, Inc.*, No. 08-23337-CIV, 2009 WL 1905035, at *8 (S.D. Fla. June 9, 2009); *In re Wasson*, No. 06:06-bk-02669-ABB, 2007 WL 4322444 (Bankr. M.D. Fla. Apr. 13, 2007); *In re Dynamic Tours & Transp., Inc.*, 359 B.R. 336, 343-44 (Bankr. M.D. Fla. 2006). Some decisions cite *Jove* for the proposition that section 105 does <u>not</u> authorize punitive damages. *Kapila v. Clark (In re Trafford Distrib. Ctr., Inc.)*, 414 B.R. 849, 857 (Bankr. S.D. Fla. 2009); *Henkel v. Lickman (In re Lickman)*, 288 B.R. 291, 293 (Bankr. M.D. Fla. 2003). Some suggest that the portion of the *Jove* decision stating that section 105 allows for punitive relief is *dictum* and should be given no weight. *See, e.g., Thigpen v. Matrix Fin. Servs. Corp. (In re Thigpen)*, No. 04-01035, 2004 Bankr. LEXIS 1136, at *8 (Bankr. S.D. Ala. Aug. 2, 2004). Both the Debtor and WBS referred to *Jove* in their arguments in this case.

In *Jove*, the 11th Circuit Court of Appeals considered alleged violations of the automatic stay by the Internal Revenue Service (the "IRS") in a case involving a corporate debtor. The corporate debtor requested both compensatory damages in the form of attorneys' fees and "severe monetary sanctions to induce IRS to cease violating the stay" which the court found to be punitive in nature.

Before addressing the extent of the contempt power under section 105, the 11th Circuit reviewed United States Supreme Court and 11th Circuit case law on the inherent contempt power of the courts, including in bankruptcy matters. *Jove Eng'g, Inc.*, 92 F.3d at 1553-54. Citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) extensively, the 11th Circuit stated that all courts possess inherent contempt power, which power is necessary to the exercise of all of the other powers given to the courts. A court's inherent contempt power is concurrent with, and not displaced by, statutes, rules, and procedures addressing the same conduct. *Id.* at 1553 (citing *Chambers*, 501 U.S. at 43-50). It is no accident that the *Jove* court paused to review the concept of inherent contempt power before addressing contempt power under section 105. The 11th Circuit wanted to make it clear that section 105 is not the only basis for addressing contempt in the bankruptcy context. The court in *Jove* focused on section 105 only because the matter involved a federal government defendant and implicated waiver of sovereign immunity under section 106. The *Jove* decision does not constrict this Court's inherent contempt power.

The *Jove* court then turned to address the power of contempt under section 105. Section 105(a) provides "the court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The 11th Circuit stated as follows:

> [Section] 105 uses the broad term "any" which encompasses all forms of orders including those that award monetary relief. . . . The broad term "any" is only

14

>limited to those orders that are "necessary or appropriate" to carry out the Bankruptcy Code. Therefore, the plain meaning of § 105 encompasses *any* type of order, whether injunctive, compensative or punitive, as long as it is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

*Id.* at 1554 (citations omitted).

The 11th Circuit's statement that section 105 encompasses the power to grant punitive relief is not necessary to the court's decision and is, therefore, *dictum*. After describing the scope of relief possible under section 105, quoted above, the *Jove* court addressed the waiver of sovereign immunity under section 106. The court ruled that section 106 limited the debtor to relief against the IRS under section 105, and that section 106 prohibited an award of punitive damages. The remainder of the decision addresses the extent to which the damages claimed by the debtor in that case were punitive in nature, in the context of the limitations of section 106. The 11th Circuit could have ruled based solely on the fact that section 106 excludes punitive damages against a governmental unit, whether or not the court below had the power to award punitive damages under section 105. Instead, the 11th Circuit expressed its view with regard to the scope of the court's power under section 105. Although not binding, the 11th Circuit's view is persuasive.[1]

It is well settled that this Court has the inherent power to award compensatory damages for willful violations of the automatic stay as this falls within the ambit of the bankruptcy court's civil contempt power. *See Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1553 (11th Cir. 1996). The district court, constituted under Article III of the Constitution, undoubtedly has inherent power to punish for criminal contempt. *Walton v. Countrywide Home Loans, Inc.*, No. 08-23337-CIV, 2009 WL 1905035 (S.D. Fla. June 9, 2009) (citing *International Union, United Mine Workers of*

---

[1] While the *Jove* court considered an order of a district court and not a bankruptcy court, there is nothing in *Jove* to imply that the 11th Circuit's view of section 105 is limited to matters before the district court. Indeed, all matters encompassed by the Bankruptcy Code, including section 105, are subject to referral under 28 U.S.C. § 157(a).

15

*America v. Bagwell,* 512 U.S. 821 (1994)). It is possible that the district court's inherent criminal contempt power may be referred to the bankruptcy court, as a unit of the district court, under 28 U.S.C. § 157(a). *In re Norris*, 192 B.R. 863, 869 (Bankr. W.D. La. 1995). However, without further guidance from the 11th Circuit Court of Appeals or the United States Supreme Court, this Court is unwilling to conclude that it has constitutional authority to address criminal contempt, absent statutory authority. *See In re Hipp, Inc*., 895 F.2d 1503, 1511-13 (5th Cir. 1990); *Walton v. Countrywide Home Loans, Inc*., No. 08-23337-CIV, 2009 WL 1905035, at *7 (S.D. Fla. June 9, 2009).

Section 105 constitutes express authority to award punitive damages for contempt to the extent necessary or appropriate to carry out the provisions of the Bankruptcy Code. Section 105 "creates a statutory contempt power distinct from the court's inherent contempt powers." *Walton*, 2009 WL 1905035, at *8 (citing *Jove Eng'g, Inc.*, 92 F.3d at 1553). "So long as the criminal contempt sanction is necessary or appropriate, a bankruptcy court has the statutory power to impose criminal sanctions." *Id.* (citing *In re Dynamic Tours & Transp., Inc.*, 359 B.R. 336, 342-43 (Bankr. M.D. Fla. 2006)).

"[P]unitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes. Such awards are 'reserved . . . for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief.' To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so." *In re Wagner*, 74 B.R. 898, 903-04 (Bankr. E.D. Pa. 1987) (quoting *Cochetti v. Desmond*, 572 F.2d 102, 106 (3d Cir.1978)). Decisions awarding punitive damages in this context typically consider the following factors: (1) the nature of the violator's conduct;

(2) the nature and extent of the harm to the debtor; (3) the violator's ability to pay; (4) the motives of the violator; and (5) any provocation by the debtor. *Id.* at 905-06; *see also In re White*, 410 B.R. 322, 327 (Bankr. M.D. Fla. 2009) (citing cases); *In re Keen*, 301 B.R. 749, 755 (Bankr. S.D. Fla. 2003) (citing various cases).

In the case at hand, WBS intentionally terminated the Debtor's internet service, knowing that this would bring the Debtor's business to a halt, after receiving unequivocal written notice of the Debtor's bankruptcy filing including a specific invocation of the automatic stay. While the Debtor was unable to provide service to tens of thousands of direct and indirect customers, WBS demanded a general release as a condition to restoring service. WBS's actions constitute "a willful disrespect" and "arrogant defiance of the bankruptcy laws." *In re White*, 410 B.R. at 327 (citing *Johnson v. Precision Auto Sales (In re Johnson),* No. 06-00164, 2007 Bankr. LEXIS 2678 (Bankr. N.D. Ala. Aug. 7, 2007)). The potential for irreparable harm to the Debtor was well known to WBS. WBS acted with malicious intent to shut down the Debtor's business. To the extent the Debtor's prior threats to file bankruptcy constitute provocation by the Debtor, such provocation pales in comparison to the actions taken by WBS. Lastly, as noted above, the Court determined that WBS is able to pay the damages awarded in this Order. All of the factors outlined in *Wagner* are satisfied in this case.

The final determination for the Court is to set an amount of punitive damages appropriate in this case. "As a general matter, punitive damages serve both as punishment for wrongful conduct and as a deterrent of future wrongful conduct." *In re White*, 410 B.R. at 327 (citing *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2621 (2008)). The Court keeps these goals in mind when setting a punitive damage award. The United States Supreme Court established the following "guideposts" for punitive damage awards: (1) the degree of reprehensibility of the

17

violator's conduct; (2) the disparity between the harm or potential harm suffered by the debtor and the punitive damages awarded; and (3) the difference between the award granted and the civil penalties imposed in similar cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-575 (1996).

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id*. at 575. In the corporate context, barring threats of physical violence, it is difficult to posit a more extreme violation of the automatic stay than WBS's actions in this case. WBS received actual notice of the bankruptcy filing, which it acknowledged in writing, which notice specifically invoked the automatic stay. Then WBS intentionally threatened the Debtor's sole source of revenue by pulling the plug on its internet service. WBS's reprehensible behavior deserves punishment sufficient to deter WBS and other entities from similar future conduct. Punitive damages of $50,000.00 are warranted in this instance.

Awarding punitive damages of $50,000.00 approximately doubles the compensatory damages awarded in this matter, which are $51,995.00. A one to one ratio of punitive to actual damages is well within the range found constitutional by the United States Supreme Court. *See id*. at 580-83; *see also Exxon Shipping Co. v. Baker,* 128 S. Ct. 2605, 2620-35 (2008) (reviewing United States Supreme Court jurisprudence). A review of decisions in bankruptcy matters reveals that an award of punitive damages in the amount of $50,000.00 in this case is consistent with awards in similar cases. *See, e.g., Nowlin v. RNR, LLC (In re Nowlin)*, No. 08-0459A, 2009 Bankr. LEXIS 2586 (Bankr. M.D. Tenn. Aug. 27, 2009); *In re White*, 410 B.R. 322 (Bankr. M.D. Fla. 2009); *In re Wasson*, No. 06:06-bk-02669-ABB, 2007 WL 4322444 (Bankr. M.D. Fla. Apr. 13, 2007); *In re Dynamic Tours & Transp. Inc.*, 359 B.R. 336 (Bankr. M.D. Fla. 2006).

ORDER

For the foregoing reasons, the Court hereby ORDERS and ADJUDGES that

1. The Motion is GRANTED;

2. The Debtor is awarded compensatory damages in the amount of $51,995.00 against WBS Connect, LLC;

3. The Debtor is awarded punitive damages in the amount of $50,000.00 against WBS Connect, LLC; and

4. The Court will enter a separate judgment in favor of the Debtor and against WBS Connect, LLC in the total amount of $101,995.00 consistent with this Memorandum Opinion and Order.

###

Copies furnished to:

Bradley S. Shraiberg, Esq.
AUST

Bradley S. Shraiberg, Esq. is directed to serve a copy of this Memorandum Opinion and Order on all interested parties who have not been served via CMECF, and to file a certificate attesting to any such service.